Good morning. David Pruitt on behalf of the plaintiffs and appellants, Yema Khalif and Howie Awash. May it please the court. The district court and my friends on their side have started this case with the premise that police were investigating suspicious activities and with a view that starts with that that would be a reasonable thing for police to do. The problem with that point of view is that it disregards facts that have been affirmatively pled in the complaint, including the facts that the officers involved knew who these shop owners were when they confronted them. When they, when someone knows the identity of another person and challenges them to identify themselves, that is an act of intimidation. The other thing that the facts, the facts that were overlooked, where it's very affirmatively pled that the plaintiffs were restocking their store. The activity of restocking a store is different than the activity of burglarizing a store or doing something of that nature. So in this case, we have two sets of facts that for the purposes of pleadings should have been accepted as true for the of a motion to dismiss under 12b-6 that contradict this idea of starting with an inference that the police were appropriately responding to some suspicious activity. With that, that leads to a both Section 1983 and Section 1985-3. The facts that I have pointed to so far, those do indicate that there was a conspiracy. And 1985-3 provides for relief against those who conspire to deprive, and the statute uses the words directly or indirectly. But now, I mean, we're now, the cases, I guess, got narrowed in terms of the number of defendants. So now what we're left with is, is the Belvedere police officer? Yes. So he came in sort of midway into this exchange? I believe that he came in, I believe the order of progression was Madfis, then Clark, Belvedere, and then Lassie, a sergeant from Tiburon. Did Clark ever have any interactions with the plaintiffs here? Yes. In terms of, you know, conversation? Because you hear in the video, you hear Madfis and then the sergeant, but how about Clark? I don't, I'm not aware of a verbal statement by Clark. I'm aware of his presence. Yeah, he's there to provide backup, according to an agreement between the two cities. What makes you think he knew something fishy was going on and that he had conspired with the Tiburon officer to racially profile and embarrass and humiliate these people? Sure. I understand the question. The store, as we alleged in the complaint, opened in February 2020. This August 21. So almost just four years ago, or just one day past. Anyway, the complaint says that the plaintiffs were familiar with the officers, including Officer Clark, and they were known that their business was on a prominent corner. It was known to be a black-owned business, that there were times where Clark himself walked or drove by. So paragraph 40 of the complaint says Clark, during that six-month period of time, had driven or walked past the store many times as both a police officer and a private citizen. Paragraph 41 alleges that the plaintiffs were stopped by police officers of both agencies, detained, questioned. And I realize this might kind of morph a bit also into Monell, but the point is that officers with both agencies were aware of these plaintiffs' identities, and that Officer Clark, in particular, was alleged to be familiar to the plaintiffs. And it seems to me that... But what facts have you applied to show that, other than that he had been on the police force for a certain amount of time and had driven by this business? Is there anything else? The fact that the plaintiffs are alleging that they saw him, and so I... But is there an allegation that he knew them? Because...  Yeah, there's an allegation, but there's no evidence. Right. What is the factual basis for the allegation? The factual basis for the allegation is the ability to recognize a person. And so the plaintiffs are saying that they recognize Clark from their prior six months' experience at the store. And that is a familiarity that any of us could have. Okay, but they recognize him doesn't mean he knew them. And even if he did know them, he's there to back up the Tiburon officer. And what does he do that shows this was a conspiracy? I mean, there was some talk about his hand was on the gun, but you don't see anything on the video that backs that up. I mean, really, what are you doing with this Belvedere thing? Shouldn't you be satisfied with the results you got on Tiburon? I mean, you have Yvonne Gonzalez Rogers. She's a great district judge. She heard the testimony. She saw the video. She made her rulings. And, you know, under Twombly and Iqbal, where are you going with this? Well, we're going with the fact that the police did know these people. And I understand that you're challenging that right now. And my response to it is that it truly is a basic human function, that there is a basic human function of now that I've seen you, I recognize you. And if I see you again, I can say, oh, I saw him somewhere before. And I'm saying that they had that. And we also know that people can recognize the recognition that occurred between two other people. If a human is walking down the street and they see two people walk by and they look at each other in a familiar way, people are able to testify about that all the time. There are, I'm sure, a myriad of crimes where there's testimony about people operating in concert with each other because they are looking at each other in a certain way and cooperating by way of recognition. And that's where this really boils down to, is the facts are alleged that there is a recognition and the analysis of the district court. I don't think there's not facts alleged that there was a recognition in that moment. I don't think there's any allegation in the complaint that when Clark appeared on the scene, he indicated knowledge of the plaintiffs. Is there? I think it's paragraph 42. I know it's ER 118, line four. He knew who they were. That's not a fact. And so, yeah, that's a that's an allegation in a complaint. But under Iqbal and Twombly, you have to do more than just throw something out there. You have to have some plausibility to things. And, you know, your plausibility is they recognized him. Therefore, he must have recognized them. And that's a stretch. Well, I think that that is taking the allegations and putting an inference on them in a way that is not required. And I think the inference actually would go the other way. I think that, you know, the circumstances that we have talked about, about being on a street corner, about actually encountering Clark himself on the street. You know, I'm not sure why the court is viewing that only as a one way occasion, because what the plaintiffs are saying is that they saw him in front of their store. And then when he was in the store and he was cooperating with these other officers for the purpose of intimidating these people, that that was that that was, at least in that moment, circumstantial evidence that they were acting on a conspiracy because they were acting as though they don't know these people, that these people and these people are actually familiar to them. And I question whether it's been plausibly alleged in the complaint. But, I mean, one could actually question whether the allegation is implausible. If what you're saying is true, that the plaintiffs knew Clark, why in this 10, 15 minute interaction on video that we've all watched, did the plaintiffs not say, Officer Clark, you know us. Please, you know, stop this interaction. There's none of that in the video. I think what you saw in the video, though, is indignation and and, you know, being. But what you're arguing, that's true. But what you're arguing here is that the plaintiffs knew Clark knew them. Why didn't why is there? If that's true, why is this nowhere expressed during the 10 minute interaction in which your clients are trying to have the police leave their shop? I would say it was expressed by the indignation that when someone asks for you, your identification, they know perfectly well who you are and you act indignant to them. It is an expression of disbelief and challenging the credibility of the person who is asking for identification to be shown. We're just in here doing our thing. We're doing our business. And on top of that, they were in there, not burglarizing, stocking shelves. It's affirmatively alleged that they were restocking shelves. I don't know why you bring up burglary. Nobody's talking about a burglary or anything. But when lights are on in a store at that particular time, I know you talk about white people sometimes work at night, too. What's wrong with the cops just checking to make sure everything's OK? And even if it's the owner, sometimes somebody might get in and be doing something like, hey, the cops are coming. I got the gun on this person. You better not do anything. Why can't they just investigate what's going on? I think that they could, first of all, it would have been obvious if they sat outside and watched for five minutes what was going on. And under these facts, no one can say that that didn't occur and that they still went in and treated them as though there was some suspicion. If I'm sitting outside of a store and I see someone stocking the shelves, there's no reason for me to be suspicious about what they're doing. They're doing what shop owners do. They're stocking the shelves. And so and when they're and I, I just would say that you're viewing the video and you're accepting that that is the universe of what the officers did. And if that is not the universe of what the officers did, if they did, if they did conspire and if they did walk in with a plan to act like to persuasively act like they don't know these people. That would be for the purpose of intimidating them. And these people are saying, look, we get stopped on the street all the time. These same police officers bother us on the street. They make us stop because we're black and identify ourselves. And this is just the culminating moment. It's the middle of the night. And and then there's the part about even the keys. If in that situation, we all know that a gesture to a pocket can be misunderstood and should be described as a misunderstood move. And all of this is a very compromising position to be in in the middle of night, surrounded by three police officers. And I get that's why the city of Tiburon said, you know, we we have some exposure here because our officer was the one taking this posture. But the other officer is just there on backup. He's what you have to have some evidence that the two of them conspired to do this together. Yeah, I'm not just not just going to be there for backup. I'm a support. You're intimidating, harassing. And and I want to be part of this conspiracy to show these black people they do not belong in our neighborhoods. But, you know, you're surmising it, but there's no evidence to support it. I mean, I will reiterate and I realize that this will be the third time that I'm saying it. And so forgive me. But, you know, that is taking the police officers point of view. And it's it is not allowing for any potential inference on the plaintiff's side that what what we are describing and if this is inartfully done, so be it. But the complaint does describe that these police officers knew them and it described facts that would support how they knew them. The fact that he's back up or not, the fact he's back up just lends more police power to the circumstance, if I could, I'd like to just reserve a little time. Yes, thank you. We'll put two minutes on the clock when you come back. Thank you. Thank you, Your Honor. May it please the court. Laurie Sobranski on behalf of the appellees. We are very lucky in this case that we have a video that shows exactly what happened with this interaction from the very start to the very end. The video was incorporated by reference. The district court relied on it. They don't challenge that decision here. So you can rely on that video when determining the plausibility of these claims. I want to talk about the allegations about Officer Clark knowing the plaintiffs. But first, I want to just frame what the plaintiffs are asking this court to conclude here. The video that you have obviously seen tells the story. A Tiburon police officer sees three unidentified people in a store at one in the morning, goes to the store to find out what is going on, if everything's okay. That is his job as a Tiburon police officer. Knocks on the door, politely asks them, says, hey guys, is everything okay? One o'clock in the morning, kind of late. Who are you? What are you doing here? Just checking to make sure everything's okay. You can see on that video they are immediately defiant. They are immediately confrontational. They refuse to answer any questions. Plaintiff Kalief demands that Officer Mathis call the supervisor, that's Sergeant Blasey. He comes in about five minutes into the interaction. When Sergeant Blasey gets there, still the plaintiffs will not answer these questions with Sergeant Blasey. About nine minutes into this discussion that's going on, a neighbor yells down, this is his store. The police officer say, thank you very much, and leave. That was the information they were looking for that the plaintiffs refused to give them. If the plaintiffs would have just answered Mathis' question when he first knocked on that door, hey, who are you? What are you doing in here? By saying, oh, hey, I'm the owner. We're just doing some inventory. Everything's good. This interaction would have been over in about 15 seconds, but that's not what happened. Officer Clark, as you point out, is the only officer that we are concerned with today. He works for Belvedere, not Tiburon. He arrived about the same time Sergeant Blasey did, so he comes in five minutes into this ten minute interaction. When he comes in, he walks right past the door. He stands to the side. He says nothing to the plaintiffs. He never engages with the plaintiffs in any way. He is, as your honor says, just there for backup. And when the neighbor confirms that, yes, the plaintiff is the owner of this door, Officer Clark does what the other officers do and just leaves the scene. What plaintiffs are asking the court to do now, despite what that video objectively and clearly shows, is to disregard the video and accept the allegations, the conclusory allegations of the complaint, that this was all a setup. That this was all feigned. That these officers actually knew who the plaintiffs were and somehow orchestrated this interaction in advance of it happening to send this message to the plaintiffs that they should leave town because they're black. The problem with this is, number one, the allegations are just not factually supported by the complaint. There's no facts to support these. And number two, this conspiracy idea makes absolutely no sense in the context of what was happening and how this situation unfolded. I won't belabor the pleading standard. You know, we're all familiar with Twombly, but that's the pleading standard that applies. And the court's job is to do two things. Number one, eliminate the allegations that have no factual support because those are not entitled to an assumption of truth. And then once that's done, determine whether the remaining properly pled factual allegations can state a plausible claim for relief in the context of the claims that are asserted and in the context of common sense, which is really important here. The claim is not plausible if there is an alternative to liability and alternative explanation for it, then the dismissal is proper and that's what the judge did in this case. The off-camera allegations are what plaintiff is talking about. They offer three of them. The first is that Clark knew plaintiffs before this incident ever happened. The second is that Clark conspired, and the third is that he treated other non-black business owners differently. The first one, that Clark knew plaintiffs before the incident is, as we've heard, kind of the key foundational allegation that they assert. But as the court has pointed out, there is no factual support for it and it cannot be assumed true. First of all, for context, the store opened in February of 2020. And the allegation of the complaint is that Clark began work with the police department in the same month, in February of 2020. In March 2020, COVID happened and shut down everything. So for most of this time, between February of 2020 and August 2020 when this incident happened, everything was shut down. The stores were closed. So there were very little opportunity for Clark in the real world to have come in contact with these folks. But second, the allegation, this is more important, the allegations themselves in the complaint are insufficient. There is no allegation in the complaint that I can recall where plaintiffs alleged that they saw Clark before and knew Clark, that he was standing outside their door. That's not in the complaint. And there's no allegation that Clark had seen them before or knew them from before. They simply allege that Clark, that the plaintiffs were well known to town officials, including Clark. But they don't say how Clark would, they don't allege that Clark had ever met them, had ever spoken to them, had ever seen them, had ever come into the store. There's none of those factual allegations for support. They do allege that Clark had driven by or walked by many times, but we can't reasonably infer that because someone walks by a store or drives by a store, they know who the owners of that store are. I personally have walked by that store a hundred times. I never knew who owned that store until this case. They allege that the plaintiffs were well known to the agencies because the Belvedere Police and the Tiburon Police had stopped the plaintiffs at some time. But they never allege that Officer Clark ever stopped these folks. And our Officer Clark would have known them through some kind of a stop, which they don't describe in the complaint. And third, I would say that this broader allegation that all the officers knew the plaintiffs is disputed by the video and the radio dispatch. The radio dispatch and the video were the exhibits that we sent over to the court separately. But on the video and the radio, it's just both. You can hear Officer Mathis, when this first happens, you can see him walking toward the store and you can hear the video, him saying, three unidentified people are in the store. Then later in the video, about four minutes in, the plaintiff asks Officer Mathis, who are you? And he says, my name is Isaac. Later, Officer Blasey says, he's never seen these plaintiffs in the store before. And as soon as the neighbor identifies them, they all leave. So the video evidence, which is not disputed for authenticity and is objective, dispels this notion that these officers knew these folks and that this was all a masterful performance by them to feign that they didn't know them. And they did this for some discriminatory purpose. The conspiracy allegation of the seconds of these, what they have called off-camera allegations. That allegation also cannot be assumed true on the face of this pleading. First of all, conspiracy requires some factual specificity to be sufficiently pled. And the allegation here is just that they conspired, that they met in advance, that they planned and prepared, and that Clark was part of this planning and preparation process. And that he participated in this conspiracy. But the only thing pled, as the court has pointed out, were the elements of the claim, and that's not enough under Twombly. But second, and as I mentioned at the beginning, and what has really kind of been the most interesting thing to me about this, is that the conspiracy notion doesn't make any sense. It is implausible on its face. Because, besides the fact that there's no factual allegations to support the argument that Clark knew these folks, Clark and the other officers would not have known that at one o'clock in the morning on this particular day, these folks would be in this store. So the allegations, they planned this whole thing in advance, but they would not have known that these folks were going to be in the store at one o'clock on this day. They would not have known that if the officers approached the store and knocked on the door, that the plaintiffs would refuse to converse with them and tell them who they are or why they were there. And that would set up the situation where they could intimidate them with this alleged prolonged detention. They just could not have planned in advance how to respond to something that they didn't know was ever going to happen. I mean, if you think about it, if this was a pre-incident agreement of some kind, what could it have been? I mean, the agreement would have had to be, if someday these plaintiffs that we know are in the store in the middle of the night. And if we all three happen to be on duty at that time, and if we all three happen to respond to the call at that time, then we're all going to pretend that we don't know these folks. And if the plaintiffs refuse to tell us who they are, then we're going to detain them and try to intimidate them because we don't want them in this town because they're black. That is nonsensical, it defies common sense and it is implausible. Mr. Bransky, you've talked about as soon as the guy across the street said, hey, it's their shop, they're the owners. They just packed up and left. But isn't it true that the Tiburon officer still wanted Mr. Kalief to show that his key actually worked? Wasn't that maybe a step too far? Well, if that was, that was the Tiburon's officer's problem and not Officer Clark. I mean, Officer Clark was there just standing in the background doing nothing. You know, Mr. Kalief may have a reason to suspect the worst here. Believe me, I've been a trial judge for 26 years in federal court, nine years in state court in Seattle. And I've seen a lot of things happen to African American people from cops that you wouldn't believe. So I don't blame Mr. Kalief for having his guard up. I don't blame him for asking for a supervisor. And I don't blame him for not wanting to show that the key worked. But as you point out, Belvedere and the officer, there's not enough there to go forward. Right, there's not enough there to go. And to be, I mean, from the Tiburon officer point of view, I don't represent them. But the officer that did ask him at the end to just put the key in the door was the young officer. When Sergeant Blasey heard that, he said, no, no, no, no, we just walk away. Next time, just walk away. So it was a learning moment for that particular officer. In terms of the allegations that Officer Clark treated non-Blackstar owners differently, of course, there's no pleading in the complaint that there was any similarly situated people that they treated differently at any time. No allegation that there was another situation that was like that, that Clark was there and Clark decided to intervene and not let the investigating officers do their job. There's just none of it. This is the problem with the complaint on whole. When it comes to the gun, because Your Honor raised the point that there was an allegation that Officer Clark was intimidating or threatening or something because he put his hand on the gun. There's no, the video actually, the two officers' videos show from different angles Officer Clark through this interaction. The moment the allegation is that he put his hand on the gun, the video does not show that. There's no authority that's cited by the plaintiffs either that says, if an officer is on scene and puts his hand on the gun or near the gun, that that somehow creates a detention where none exists. But they do allege in the complaint that at the moment when plaintiff was going to reach for the keys to put the key in the door. At that moment of this interaction, the plaintiffs allege that they perceived that Officer Clark was starting to remove the gun from the holster. We happen to have on the video tape of that, those moments when that was happening, when he was about to reach for the keys. And you can see Officer Clark clearly standing with his elbow kind of resting on the gun, his hand completely dangling in front of his body, and he is in a very relaxed position. So there's no indication on this video that Officer Clark was doing what the allegation is. And in that situation, the court is entitled to look at the video for an objective statement of what the actual facts were, even if it's played differently in the complaint. I'm out of time, but if the court has any questions, I'm happy to answer them. Thank you. Thank you. Thank you, Ms. Zebronski. Mr. Pruitt, rebuttal? Thank you. Quickly, the kind of sarcastic tone about the idea that it's impossible for three people to, in the moment, decide that they are going to confront people, that's pure speculation. And again, we believe that we have affirmatively alleged an awareness of who these people are, that they were systematically being treated unfairly in this town, and that when, yes, when the opportunity came up to get in their face, these people took the opportunity. How they arranged that is another story that we don't know all the details of. And yeah, it's not recorded on video, but the facts alleged are that these police officers knew who these people were. And if the facts were perceived as somehow not quite sufficient on that, it seems that the complaint was close enough by alleging that these people knew who the police were, that the police knew who they were. And this idea that the video just resolves all things, that this is somehow turned into a summary judgment, that's not right either. The fact that judicial notice was taken of the video doesn't mean that all of the factual allegations about what people perceive during a circumstance or what they knew before or after the circumstance are to be ignored. That's just not the law. And that was cited in our brief, I forget the Kaji case, I think it was something along those lines that talked about the danger of what just happened in this courtroom. Presenting the video as though there's no reason for us to ever send a case like this to trial. All we gotta do is look at the video. It doesn't matter whether or not these police officers did know these people and did want to find an opportunity to intimidate them to try to send them a message. So I appreciate the opportunity to argue. Thank you, Mr. Pruitt. Thank you, Mr. Bronski. This matter is submitted.
judges: BRESS, VANDYKE, Lasnik